**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHEN DISTRICT OF OHIO
WESTERN DIVISION**

| | | |
|---|---|---|
| Linda Mazurkiewicz, | : | Case No. 3:09CV0167 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social Security, | : | **MAGISTRATE'S REPORT AND RECOMMENDATION** |
| Defendant. | : | |

Plaintiff seeks judicial review, pursuant to 42 U. S. C. § 405(g), of Defendant's final determination denying her claims for Widow's Insurance Benefits(WIB) under Title II and Supplemental Security Income (SSI) under Title XVI of the Social Security Act (Act).  Pending are the parties' Briefs on the Merits and Plaintiff's Reply (Docket No. 13, 16 & 17).  For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the Magistrate.

I.  **PROCEDURAL BACKGROUND**

On August 17, 2004, Plaintiff filed an application for WIB and SSI (Tr. 53-54, 469-471). The applications were denied initially and upon reconsideration (Tr. 38-42, 48-50).

On January 24, 2006, Plaintiff requested a hearing before an administrative law judge (Tr. 51-52). Plaintiff, represented by counsel, and Dr. Joseph Havranek, a Vocational Expert (VE) appeared and testified at a hearing conducted on November 26, 2007, by Administrative Law Judge (ALJ) Bryan Bernstein (Tr. 475).  The ALJ issued an adverse decision denying Plaintiff's applications for WIB and SSI on June 23, 2008 (Tr. 10-23).  On November 26, 2008, the Appeals Council denied Plaintiff's request for review

rendering the ALJ's decision the final decision of the Commissioner (Tr. 2-4).

## II. **FACTUAL BACKGROUND**

At the time of the ALJ hearing, Plaintiff was 53 years of age (Tr. 55). When testifying about her work history, she stated that she quit her job as cashier in an auto parts store because her employer refused to grant her leave for a medical appointment (Tr. 482). Plaintiff had also worked at Tony Paco's Café once a week on Saturdays for ten hours (Tr. 489). Plaintiff did not work after the birth of her child in December 1990. Plaintiff and her husband raised their daughter until he died in 2002 (Tr. 483).

In 1996, Plaintiff had an automobile accident, and her injuries included total body whiplash. She wore a neck brace and took thirteen pills daily (Tr. 483-484). She walked with a cane (Tr. 492). In addition, Plaintiff was treating for emphysema, asthma, fibromyalgia, borderline rheumatory arthritis and bulging discs in her neck (Tr. 485, 488, 490). She used an "atomizer" as needed, to assist with breathing (Tr. 488, 493). Plaintiff had undergone unsuccessful epidural injections, physical therapy, aquatic therapy and pain management. The pain persisted in her neck and shoulders, radiating throughout her entire body (Tr. 490-491).

During a typical day, Plaintiff drove her daughter to school (Tr. 492); however, she drove only during the day and for short periods of time (Tr. 486). After taking her daughter to school, Plaintiff read the paper and waited until she discovered "something to do" (Tr. 492). She called her sister when she needed to shop for groceries (Tr. 492-493). She did not go up or down stairs (Tr. 487). Occasionally, she vacuumed the first floor of her home and shopped using a motorized cart (Tr. 487, 488) When cooking, Plaintiff used a computer chair with wheels for mobility in the kitchen (Tr. 487). Her meal preparation was limited to simple dishes (Tr. 493).

The VE testified that someone who is not able to perform work that imposes close regimentation

or production, requires a sit and stand option, is limited to walking not more than 75% of an eight-hour workday, could not perform work involving constant manipulation, gripping, grasping, twisting, turning and could not work in atmospheric concentrations of dust, smoke, fumes or temperature and humidity extremes, such a person could perform, however, work as a photocopy machine operator, mail clerk and hand packager. There are approximately 750, 1,000 to 1,500 and 3,000 to 4,000, respectively, such unskilled jobs performed at the light unskilled level in the Toledo Metropolitan region (Tr. 494-495, 502). Plaintiff's level of work could not expand to medium work because of her inability to stand more then 75% during an eight-hour workday (Tr. 495-496).

### III. MEDICAL EVIDENCE

In June 2000, Plaintiff consulted with Dr. William G. James, Jr., an anesthesiologist, for treatment of pain not relieved through ordinary measures. Dr. James prescribed a muscle relaxant and referred Plaintiff to a "pain psychologist" (Tr. 435-437). Plaintiff's list of medications was extensive and included: Neurontin, Bengal, Synthroid, Lioresal, Elavil, Ultram, Arthrotec, Imitrex, Prilosec, Singular, Proventil, Theodur, Flovent, Cyclocort, Prednisone, Combivent inhaler, Wellbutrin SR, numerous vitamins and mineral supplements (Tr. 436). In November 2000, Dr. James noted that Plaintiff had been treated with narcotics for a time. He employed a non-narcotic approach to therapy, continuing the muscle relaxer and antidepressant therapies (Tr. 433).

Plaintiff's rehabilitation potential through physical therapy was considered fair on November 20, 2000 (Tr. 462-465). On November 27, 2000, Plaintiff's tolerance of the treatment was considered poor to satisfactory (Tr. 459). Plaintiff continued "to tense" and she could not tolerate movement; however, she was able to walk and get up and down from a chair with less effort on December 20, 2000 (Tr. 457). Plaintiff's symptoms of chronic pain were characterized as fibromyalgia on December 20, 2000 (Tr. 456).

By January 16, 2001, Plaintiff was tolerating physical therapy well (Tr. 450). At the program's conclusion, Plaintiff had met her goals of using adaptive equipment to increase function and decrease difficulty with activities of daily living. She was able to perform a home exercise program with assistance from others and she was able to ambulate with a cane independently (Tr. 445, 448, 451, 462).

A magnetic resonance imaging (MRI) test administered on March 22, 2001, showed a very mild degree of circumferential bulging disc at L4-5 and L5-S1 (Tr. 432). Dr. James administered lumbar epidural steroid injections on April 25, May 7, July 16, October 17 and November 6, 2001 (Tr. 422-423, 424-425, 426-427, 428-429, 430-431). Three weeks later, Dr. James administered a sacroiliac joint and diagnostic facet injection at L4, L5 and S1 (Tr. 420).

On April 9, 2002, Plaintiff's prescription for pain medication was altered to prevent gastric upset (Tr. 419). Plaintiff underwent another course of epidural steroid injections on April 17, May 9, and December 19, 2002 (Tr. 412-417).

On September 12, 2002, Plaintiff's anti-nuclear antibodies showed signs of abnormality (Tr. 443). The ultrasound of the gallbladder was normal (Tr. 439). Results from the upper gastrointestinal endoscopy showed mild reflux (Tr. 440). During September and December 2002, Plaintiff underwent a lipid profile examination, an ultrasound, an endoscopy and a chest X-ray. The results from the lipid profile showed evidence of high cholesterol and very low density (Tr. 443). The chest X-ray showed no evidence of abnormality (Tr. 441).

Plaintiff underwent a series of three lumbar epidural steroid injections on June 18, July 8, and July 18, 2003 (Tr. 400, 404). Plaintiff underwent another series of injections on February 10 and February 24, 2004 (Tr. 392-395).

Dr. Ted Barber increased the dosage of medication to treat depression and anxiety in September

2003 (Tr. 381). He observed on June 3, 2004, that Plaintiff walked with the use of a cane and that she had a limited range of motion in her cervical spine (Tr. 380). On June 7, 2004, the results from the motor nerve study were deemed abnormal showing a mild motor neuropathy manifested by prolongation of the motor nerve action potential (Tr. 377-379). He diagnosed Plaintiff with mild motor neuropathy (Tr. 376). Dr. Barber noted in January 2005, that Plaintiff's medication regimen had been successful in controlling the pain in her neck, back and extremities (Tr. 374).

The X-rays of Plaintiff's cervical spine, administered on October 10, 2003, showed normal alignment (Tr. 383).

A chest X-ray administered on November 2, 2003, was normal (Tr. 410). In December 28, 2003, Dr. David J. Ferner, an emergency medicine physician, prescribed medication to treat an allergic reaction to hives (Tr. 407).

From January 26, 2004, through August 1, 2005, Dr. Tanya Baldwin, a family practitioner, monitored Plaintiff's drug therapy for a myriad of symptoms emanating from chronic back pain, degenerative disc disease, neck pain, gastrointestinal reflux disease, prolonged elevation of cholesterol, vitiligo, scabies and dermatitis (Tr. 294-309). On February 5, 2004, she discovered a thyroid nodule (Tr. 322). On February 13, 2004, the amount of thyroid hormone circulating in the blood was low so Dr. Baldwin prescribed a synthetic thyroid hormone (Tr. 322, 323). On August 12, 2004, Dr. Jyoti M. Chakravarty discontinued the thyroid prescription (Tr. 318).

An MRI administered on March 5, 2004, of the cervical and thoracic spine, showed relatively mild cervical spondylosis, degenerative disc disease and a normal thoracic spine (Tr. 319, 320).

On May 7, 2004, Dr. Thomas G. Andreshak, an orthopedic surgeon, diagnosed Plaintiff with the least advanced spondylolisthesis at L4-L5 (Tr. 390).

In April 2004, Dr. Navin K. Jain, a pulmonary and sleep specialist, prescribed Advair and recommended that Plaintiff continue using a medication prescribed to relieve coughs (Tr. 388). He continued her medications in May 2004 (Tr. 387). Although Plaintiff continued to have a runny nose and drainage, she was considered "doing fair" in September 2004 (Tr. 386). Dr. Jain administered a steroid injection intramuscularly on January 10, 2005, to treat increased shortness of breath (Tr. 248).

On September 20, 2004, Plaintiff's bone density scan was normal (Tr. 313).

Commencing in February 2005, Plaintiff was periodically treated at Toledo Clinic Pulmonology for a tickle in her throat, asthma, rhinitis, strep throat and sinusitis. Drug therapy was used to control the symptoms (Tr. 235-247).

Dr. Jerome Zake, Ph.D., conducted a clinical interview on February 8, 2005, after which he diagnosed Plaintiff with a dysthymic disorder, spinal problems, and moderate symptoms or moderate difficulty in social, occupational, or school functioning (Tr. 373).

Although Plaintiff complained of burning in her chest with a cough, the results from the chest X-ray administered on March 21, 2005, were normal (Tr. 365). Plaintiff's white blood cells were within a normal range when tested on March 30, 2005 (Tr. 334).

Dr. Vicki Casterline, Ph. D., conducted a mental residual functional capacity (RFC) assessment and a psychiatric review on March 31, 2005, and made findings based on the medical records and Plaintiff's claim that she was disabled due to depression. She diagnosed Plaintiff with a dysthymic disorder. Dr. Casterline found Plaintiff's claims mostly credible. The summary conclusions were based upon evidence that Plaintiff had moderate limitations in her ability to understand, remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, interact appropriately with the general public, accept instructions and respond appropriately and get along with coworkers or

peers without distracting them or exhibiting behavioral extremes (Tr. 346-363).

Dr. Robert Norris conducted a physical RFC on April 1, 2005. It was his opinion that Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; she could stand and/or walk about six hours in an eight-hour workday and sit, with normal breaks, about six hours in an eight-hour workday and Plaintiff could engage in unlimited pushing and/or pulling (Tr. 339). Climbing using a ladder/rope/scaffold and exposure to extreme cold, extreme heat, humidity, fumes and odors were contraindicated (Tr. 340, 342). However, Plaintiff could occasionally stoop, kneel, crouch and crawl (Tr. 340). There were no manipulative, visual or communicative limitations noted (Tr. 341, 342).

On April 12, 2005, Dr. G. Mark Burton, an oncologist, interpreted laboratory work showing white blood cells at risk. Plans included conducting a complete blood count "every couple of weeks" (Tr. 330-331). Dr. Burton concluded that Plaintiff did not have a hematologic disorder on May 24, 2005 (Tr. 328).

Plaintiff's blood sugar Co2 and alkaline phosphatase levels were elevated when tested on May 20, 2005 (Tr. 332).

In August 2005, Dr. Glenn Swimmer, Ph. D., opined that Plaintiff exhibited disinhibition and her mood was depressed. Her symptoms had responded poorly to treatment (Tr. 326-327).

Dr. Caroline Lewin, Ph. D., conducted a clinical interview on October 20, 2005, and she found that Plaintiff was moderately limited in her ability to maintain attention and concentration for extended periods, complete a normal workday and workweek, interact appropriately with the general public, get along with co-workers or peers without distracting them or exhibiting behavioral extremes and respond appropriately to changes in the work setting (Tr. 283-284). Similarly, in the psychiatric review, Dr. Lewin opined that Plaintiff had moderate restrictions in activities of daily living, maintaining social functioning and maintaining concentration, persistence or pace (Tr. 279). She confirmed Dr. Casterline's diagnosis of a

dysthymic disorder (Tr. 272).

The X-rays administered on November 8, 2005 of the chest and neck showed no evidence of abnormality (Tr. 229). On November 14, 2005, Dr. Jain described Plaintiff's medical conditions as asthma, sinusitis and restless leg syndrome (Tr. 232). Plaintiff was limited to sitting/walking up to one half hour, and sitting for one hour in an eight-hour workday. Plaintiff suffered from marked limitations in her ability to push/pull, bend, reach, handle and engage in repetitive foot movements (Tr. 233).

Plaintiff's lung and breath volumes were normal on November 25, 2005 (Tr. 251). In fact, the maximum amount of air that Plaintiff could expel and the maximum speed of expiration were within a normal range (Tr. 252-259).

Dr. Barber noted on March 17, 2006, that Plaintiff "dragged her right foot" when walking (Tr. 221).

Dr. Vivek K. Trivedi, an anesthesiologist, administered four facet joint injections commencing on July 20, 2007 (Tr. 194-202).

Brian L. Ackerman, a licensed physical therapist, conducted an evaluation on September 4 and 5, 2007. He concluded that Plaintiff was currently limited to less than sedentary work because of the physical weakness, severe pain level and limited mobility. He recommended that Plaintiff refrain from lifting below 10 inches from the floor, one arm carry, carrying items while ascending stairs and constant or repetitive lifting/carrying tasks (Tr. 72-79).

## IV.  STANDARD OF DISABILITY UNDER WIB

The Social Security act provides for payment of WIB to disabled widows between the age of 50 and 60, whose spouses died fully insured. 42 U. S. C. § 402(e) (Thomson Reuters 2009). In order to be entitled to such benefits, a widow must establish that her physical or mental impairment or impairments are of a level of severity which, under regulations prescribed by the Commissioner, is deemed to be

sufficient to preclude her from engaging in *any* gainful activity. 42 U.S.C. § 423(d)(2)(B) (Thomson Reuters 2009).

A widow will be adjudged disabled if she suffers from a medically determinable impairment which meets the durational requirement. 20 C. F. R. § 404.1577 (Thomson Reuters 2009). As long as she is not working, she can establish the required degree of severity of impairment by presenting clinical findings that are the same as those of an impairment listed in Appendix 1 to Subpart P, 20 C. F. R. Part 404, or from one or more unlisted impairments that singly or in combination are the medical equivalent of a listed impairment. 20 C. F. R. § 404.1577 (Thomson Reuters 2009).

## V. STANDARD OF DISABILITY FOR SSI.

Plaintiff can receive benefits under Title XVI only if she is deemed "disabled" as defined under the Act. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. *Ridge v. Barnhart*, 232 F. Supp. 2d 775, 785 (N. D. Ohio 2002) (*citing* 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A)). In applying this standard, the Commissioner has promulgated regulations setting forth a five-step sequential evaluation process. *Id.* (*citing* 20 C.F.R. §§ 404.1520 and 406.920). The ALJ must proceed through the required sequential steps for evaluating entitlement to disability insurance benefits. *Id.* The Sixth Circuit has summarized the steps as follows:

1. If claimant is doing substantial gainful activity, the claimant is not disabled.
2. If claimant is not doing substantial gainful activity, the claimant's impairment must be severe before he or she can be found to be disabled.
3. If claimant is not doing substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and the claimant's impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.
4. If claimant's impairment does not prevent him or her from doing past relevant work, the

        claimant is not disabled.
5. Even if claimant's impairment does prevent him or her from doing past relevant work, if other work exists in the national economy that accommodates his or her residual functional capacity and vocational factors (age, education, skills, etc.), the claimant is not disabled.

*Id.* at 785-786 (*citing Lyons v. Social Security Admin.,* 19 Fed. Appx. 294, 2001 WL 1110110, *5 (6th Cir. 2001), unpublished; *Walters v. Commissioner of Social Security,* 127 F.3d 525, 529 (6th Cir. 1997), *and* 20 C. F. R. § 404.1520(b)-(f)).

The claimant has the burden of going forward with the evidence at the first four steps and the Commissioner has the burden at Step Five to show that alternate jobs in the economy are available to the claimant, considering his age, education, past work experience and residual functional capacity. *Id.* (*citing Moon v. Sullivan,* 923 F.2d 1175, 1181 (6th Cir. 1990)).

## VI. ALJ DETERMINATIONS

After careful consideration of the entire record, the ALJ made these findings:

1. Plaintiff was an unmarried widow of the deceased insured working and had attained the age of 50 years. She met the non-disability requirements for disabled widow's benefits as set forth in Section 202(e) of the Act.

2. The prescribed period ended on June 30, 2009. Plaintiff had not engaged in substantial gainful activity since July 30, 1996, the alleged onset date.

3. Plaintiff had severe impairments; however, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments of 20 C. F. R. 404, Subpart P, Appendix 1.

4. Plaintiff was not reliable.

5 Plaintiff had the RFC for a restricted range of work activity described as lifting no more than twenty pounds occasionally and five pounds frequently. Plaintiff required a sit/stand option while working and relevant impairments prevented her from standing and walking longer than 75% of an eight-hour workday.

6. Plaintiff had no past relevant work.

7. Plaintiff was born on January 25, 1954 and she was 34 years of age on the alleged onset date and

      she was 50 years of age at the time her application was filed.  Plaintiff had at least a high school education and was able to communicate in English.  Considering Plaintiff's age, education, work experience and RFC, there were jobs in the national economy that existed in significant numbers that Plaintiff could perform.

8.     Plaintiff had not been under a disability as defined in the Act from July 30, 1996, through June 23, 2008.

      (Tr. 10-23).

## VII. STANDARD OF REVIEW

The district court exercises jurisdiction over the review of the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3).  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832 (6th Cir. 2006).  In reviewing the Commissioner's decision, the court must only determine whether substantial evidence in the record supports the finding, and whether the ALJ applied the proper legal standards in reaching his or her decision.  *Stoker v. Commissioner of Social Security,* 2008 WL 1775414, *3 (N. D. Ohio 2008) (*citing* 42 U.S.C. § 405(g); *Brainard v. Secretary of Health & Human Services*, 889 F.2d 679, 681 (6th Cir. 1989); *Richardson v. Perales,* 91 S. Ct. 1420, 1427 (1971)).  The court "may not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Id.* (*citing Cutlip v. Secretary of Health & Human Services,* 25 F.3d 284, 286 (6th Cir. 1994); *Richardson, supra,* 91 S. Ct. at 1427; *Garner v. Heckler,* 745 F.2d 383, 387 (6th Cir. 1984); *Myers v. Richardson,* 471 F.2d 1265, 1266 (6th Cir. 1972)).  If substantial evidence supports it, the court must affirm the ALJ's decision, even if the reviewing court would decide the matter differently.  *Id.* (*citing* 42 U.S.C. § 405(g) (1998); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983)).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (*citing Brainard, supra,* 889 F.2d at 681; *Consolidated Edison Company v. National Labor Relations Board,* 59 S. Ct. 206, 216-217 (1938)).  In

determining whether substantial evidence in support exists, the court will view the record as a whole, *Id.* (*citing Allen v. Califano,* 613 F.2d 139, 145 (6th Cir. 1980), and consider anything in the record suggesting otherwise. *Id.* (*citing Beavers v. Secretary of Health Education and Welfare,* 577 F.2d 383, 387 (6th Cir. 1978)).

## VIII.  DISCUSSION

Plaintiff alleges five errors by the ALJ.

(1) The ALJ impermissibly required disease process confirmed by imaging as proof of Plaintiff's symptoms.
(2) The ALJ erroneously stated that all recommended treatment has been conservative and minimal.
(3) The ALJ found that the RFC is not compliant with the regulation definition of either sedentary or light work.
(4) The ALJ failed to adequately explain his credibility determinations.
(5) The ALJ rejected the opinion of the treating physicians, namely, Dr. Swimmer and Dr. Jain.

Defendant argues that the ALJ's decision that Plaintiff was not disabled is supported by substantial evidence. The ALJ considered the requisite credibility factors and reasonably concluded that Plaintiff's complaints of disabling pain were not fully credible. Plaintiff's RFC fits squarely with the definition of sedentary or light work.

In the first claim, Plaintiff states that the ALJ impermissibly required "disease process confirmed by imaging" as proof of Plaintiff's symptoms (Docket No. 13, p. 9, Tr. 21). The Magistrate finds that this statement is taken out of context. The ALJ explained that the extreme limitations displayed at the functional capacity evaluation conducted on September 4 and 5, 2007, were in excess of any disease process confirmed by MRI, X-rays or any limitation expressed by Plaintiff prior to that date. In other words, the limitations exhibited during the conduction of diagnostic tests were inconsistent with Plaintiff's subjective complaints made prior to September 4 or 5, 2007. The ALJ's statement is not construed as

12

requiring disease process confirmed by imaging.

Plaintiff contends in her second argument that the ALJ erroneously stated that all recommended treatment had been conservative and minimal although she had undergone no less than fourteen epidural injections.

Apparently, the ALJ considered conservative treatment as treatment that avoided radical operative procedures. Even if the ALJ mischaracterized this treatment as conservative, he did consider the injections and their effect on the management of Plaintiff's pain (Tr. 19-20). The Magistrate is not persuaded that categorizing treatment that included injections as conservative is probative of disability. Also, Plaintiff contends that the ALJ erred in considering that all recommended treatment has been minimal. Plaintiff did undergo extensive evaluation and treatment since early 2005 for back, neck or other body pain. On January 24, 2005, Dr. Barber noted that Plaintiff's pain in her neck and back was controlled by the medication regimen (Tr. 374). Thereafter, the only medical evidence of treatment for pain included a series of four epidural steroid injections in May, June and July 2007 (Tr. 194-200). Dr. Trivedi noted that Plaintiff was provided good relief as a result of the injections (Tr. 201-202) In the context of the extensive treatment that preceded January 24, 2005, the management of Plaintiff's pain after January 24, 2005, was minimal. The ALJ's characterization of four treatments as minimal is consistent with the medical evidence.

In her third claim, Plaintiff claims that the ALJ's RFC finding is inconsistent with the regulatory definition of either sedentary or light work as defined at 20 C. F. R. § 404.1567 or the DICTIONARY OF OCCUPATIONAL TITLES.

The regulations define sedentary work as the ability to (1) lift no more than ten pounds at a time; (2) occasionally lifting or carrying articles like docket files, ledgers, and small tools; and (3) walk and stand occasionally. 20 C. F. R. § 404.1567 (a) (Thomson Reuters 2009). Light work involves (1) lifting no more

13

than twenty pounds at a time; (2) frequent lifting or carrying of objects limited to those objects weighing up to ten pounds; and (3) a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. 20 C. F. R. § 404.1567 (b) (Thomson Reuters 2009).

Here, the ALJ found that Plaintiff's RFC was restricted to a range of activity that involved no lifting more than twenty pounds occasionally and five pounds frequently with a sit/stand option while working and standing and walking less than 75% of the eight-hour workday. Contrary to Plaintiff's argument, this RFC is consistent with the Commissioner's definition of light work.

In her fourth claim, Plaintiff contends that the ALJ failed to explain his credibility determinations, instead referring to reliability. Nevertheless, Plaintiff argues that her credibility was supported by the medical evidence. Plaintiff tested positive for Patrick's Test, dragged her foot, had severe pain and palpated tender spots and a limited range of motion. All of these symptoms Plaintiff contends support a finding of credibility.

The ALJ is responsible for evaluating the credibility of witnesses, including that of the claimant. *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 247 (6th Cir. 2007) (*citing Walters, supra*, 127 F.3d at 531; *Crum v. Sullivan,* 921 F.2d 642, 644 (6th Cir. 1990); *Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 538 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2428). However, the ALJ is not free to make credibility determinations based solely upon an "intangible or intuitive notion about an individual's credibility." *Id.* (*citing* SOC. SEC. RUL. 96-7p, 1996 WL 374186, at * 4). Rather, such determinations must find support in the record. *Id.*

Whenever a claimant's complaints regarding symptoms, or their intensity and persistence, are not supported by objective medical evidence, the ALJ must make a determination of the credibility of the claimant in connection with his or her complaints "based on a consideration of the entire case record." *Id.*

The entire case record includes any medical signs and lab findings, the claimant's own complaints of symptoms, any information provided by the treating physicians and others, as well as any other relevant evidence contained in the record. *Id.* Consistency of the various pieces of information contained in the record should be scrutinized. *Id.* at 247-248. Consistency between a claimant's symptom complaints and the other evidence in the record tends to support the credibility of the claimant, while inconsistency, although not necessarily defeating, should have the opposite effect. *Id.*

SOC. SEC. R. 96-7p also requires the ALJ explain his or her credibility determinations in the decision such that it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* In other words, blanket assertions that the claimant is not believable will not pass muster, nor will explanations as to credibility which are not consistent with the entire record and the weight of the relevant evidence. *Id*.

The Magistrate agrees with Plaintiff that the regulations require that the ALJ consider credibility, not reliability. However, the ALJ's semantic reference to reliability is actually a discussion of Plaintiff's credibility. The ALJ's credibility determination includes a detailed discussion of the medical signs and laboratory findings, Plaintiff's own complaints of symptoms and any information provided by the treating physicians from which the ALJ could glean trustworthiness. The ALJ found the inconsistencies in this evidence sufficient to support a finding that Plaintiff's credibility was questionable. The discussion that Plaintiff was less than credible is sufficiently specific to make clear to this fact-finder the reasons that the ALJ found Plaintiff's testimony unbelievable. The undersigned finds that the ALJ's credibility finding referred to as a reliability argument is, in fact, a credibility determination consistent with the regulations.

Finally, Plaintiff suggests that the ALJ erred in rejecting the opinions of the treating psychologist,

Dr. Swimmer and treating physician Dr. Jain. The Magistrate finds that the ALJ did not summarily reject the opinions of either physician but he properly discounted both of them.

It is well established that the ALJ is bound by certain governing standards, key among them is the principle that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule. *Rogers*, *supra*, at 241 (*citing* SOC. SEC. RUL. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Commissioner of Social Security,* 378 F.3d 541, 544 (6th Cir. 2004). *Id.* Because treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone," their opinions are generally accorded more weight than those of non-treating physicians. *Id.* (*citing* 20 C. F. R. § 416.927(d)(2)). Therefore, if the opinion of the treating physician as to the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record," then it will be accorded controlling weight. *Id.* (*citing Wilson,* 378 F.3d at 544).

When the treating physician's opinion is not controlling, the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.* However, in all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding. *Id.* (*citing* SOC. SEC. RUL. 96-2p, 1996 WL 374188, at *4).

The ALJ must provide "good reasons" for discounting treating physicians' opinions, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the

16

treating source's medical opinion and the reasons for that weight." *Id.* (*citing* Soc. Sec. R. 96-2, 1996 WL 374188, at *5). The purpose of this procedural aspect of the treating physician rule is twofold. *Id.* First, the explanation " 'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.' " *Id.* at 242-243 (*citing Wilson, supra*, 378 F.3d at 544) (*quoting Snell v. Apfel*, 177 F.3d 128, 134 (2nd Cir.1999)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* Because of the significance of the notice requirement in ensuring that each denied claimant receives fair process, a failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record. *Id.*

Considering these standards, the Magistrate finds that the ALJ was not bound by any of Dr. Swimmer's findings. The ALJ acknowledged that Dr. Swimmer was convinced that Plaintiff could not work well with others (Tr. 17). He did not place much weight on this opinion as Dr. Swimmer failed to explain the nature and severity of the claimant's condition and support it with medically acceptable clinical and laboratory diagnostic techniques. In sum, Dr. Swimmer's opinion was inconsistent with the rest of the medically determinable evidence. The ALJ's decision to reject Dr. Swimmer's opinions is well documented and, thus, consistent with the regulations.

In her Response, Plaintiff asserts that if the ALJ had adopted Dr. Jain's opinions that she has extreme functional limitations that restrict her to the performance of sedentary work, then a finding of disability would have resulted in the use of the Medical Vocational Guidelines. The Magistrate finds that

17

the ALJ was not bound by Dr. Jain's opinions in employing the Medical Vocational Guidelines. The medical opinions of Dr. Jain are, in large part, unsupported by the evidence. Moreover the ALJ found that the finding of functional limitations was based on Plaintiff's subjective complaints. The ALJ thoroughly discussed his consideration of Dr. Jain's opinions, the reasons for discounting this opinion and the evidence that supported his decision,

## VIV.  CONCLUSION

Since Plaintiff has been unable to show that she is under a disability, she is not entitled WIB and SSI. In view of the foregoing, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the Magistrate.

/s/Vernelis K. Armstrong
United States Magistrate Judge

Date:   January 5, 2010

## NOTICE

Please take notice that as of this date the Magistrate's Report and Recommendation attached hereto has been filed.

Please be advised that, pursuant to Rule 72.3(b) of the Local Rules for this district, the parties have fourteen (14) days after being served in which to file objections to said Report and Recommendation. A party desiring to respond to an objection must do so within fourteen (14) days after the objection has been served.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and

Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.